**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI**

MAXUS REALTY TRUST, INC., )
                                              )
                     Plaintiff, )
                                              )
      vs. )            Case No. 06-0750-CV-W-ODS
                                              )
RSUI INDEMNITY COMPANY, )
                                              )
                     Defendant. )

## DEFENDANT'S SUGGESTIONS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

CLAUSEN MILLER P.C.

Courtney E. Murphy, *admitted pro hac vice*
David A. Group, *admitted pro hac vice*
One Chase Manhattan Plaza, 39th Floor
New York, New York 10005
Telephone:     (212) 805-3908

and

SHOOK, HARDY & BACON L.L.P.

George E. Wolf, Mo. # 35920
Douglas S. Beck, Mo. # 49984
2555 Grand Boulevard
Kansas City, Missouri 64108-2613
Telephone:     (816) 474-6550

ATTORNEYS FOR DEFENDANT
RSUI INDEMNITY COMPANY

# TABLE OF CONTENTS

**SECTION**                                                                 **PAGE**

TABLE OF CONTENTS.................................................................................................ii

TABLE OF AUTHORITIES..........................................................................................iii

INTRODUCTION........................................................................................................1

I.      STATEMENT OF UNCONTESTED FACTS.................................................4

II.     LAW AND ARGUMENT.................................................................................13

        A.      Standard of Review...............................................................................13

        B.      Choice of Law.......................................................................................14

        C.      Unambiguous policy provisions must be enforced as
                written....................................................................................................16

        D.      There is no coverage for any damages to the Waverly Apartments caused
                exclusively by flood or by any combination of winds and rain occurring in
                sequence or concurrently with Hurricane Katrina-generated storm surge..........17

        E.      The Occurrence Limit of Liability Endorsement unequivocally limits
                coverage to the values stated for the Waverly Apartments contained in
                the Statement of Values.........................................................................25

        F.      Maxus is not entitled to Replacement Cost Value for the damages to the
                Waverly Apartments...............................................................................30

        G.      RSUI is entitled to a set-off for the payments made by First Specialty
                and Hartford..........................................................................................32

III.    CONCLUSION..................................................................................................33

**TABLE OF AUTHORITIES**

**CASES**                                                                                                  **PAGE**

*Anderson Mattress Co. Inc., v. First State Ins. Co., 617 N.E.2d 932,934*
*(Ind. Ct. App. 1993)*...................................................................................................................28

*Ashland Chem. Inc. v. Barco Inc., 123 F.3d 261, 265 (5ᵗʰ Cir. 1997)*.........................................14

*Berkshire Mut. Ins. Co. v. Moffett, 378 F.2d 1007, 1011 (5th Cir. 1967)*...............................32, 33

*Caldwell Freight Lines, Inc. v. Lumbermens Mutual Ins. Co., Inc.,*
*947 So.2d 948 (Miss. 2007)*...................................................................................................17

*Celotex Corp. v. Catrett, 477 U.S. 317 (1986)* ....................................................................13, 14

*Cole v. Celotex Corp., 599 So.2d 1058, 1080 (La. 1992)*............................................................33

*Crown Center Redevelopment Corp. v. Occidental Fire & Cas.*
*Co. of North Carolina, 716 S.W.2d 348, 358 (Mo. App. 1986)*....................................................15

*Collins v. State Farm Mut. Auto Ins., 902 F.2d 1371, 1372 (8th Cir. 1990)*..........................15, 16

*Egnotic v. Nguyen, 113 S.W. 3d 659, 665 (Mo. App. W.D. 2003)*.................................................14

*Employers Mutual Casualty Co. v. Nosser, 250 So.2d 542 (1964)*................................................16

*Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78*............................................................................14

*Fair Grounds Corp. v. Travelers Indemnity Company of Illinois,*
*742 So2d. 1069 (La.App. 5 Cir. 1999)*...........................................................................27, 28, 29

*Ferguson v. State Farm Insurance Co., 2007 WL 1378507 (E.D.La., 2007)*……………….......32

*Fire Ass'n of Phil. v. Coomer, 158 S.W.2d 355 (1942)*................................................................30

*Federal Savings & Loan Insurance v. Kralj, 968 F.2d 500,*
*503 (5ᵗʰ Cir. 1992)*..................................................................................................................13

*Goman v. New Hampshire Insurance Company, 159 F. Supp.2d 928*
*(N.D. Tex. 201)*.......................................................................................................................31

*Harrington v. Amica Mutual Insurance Company, 223 A.D.2 222,*
*645 N.Y.S.2d 221 (1996)*..........................................................................................................31

*Hess v. North Pacific Insurance Company, 122 Wash.2d 180, 859 P.2d 586 (Wash. 1993) en banc*................................................................31

*Higgins v. Insurance Company of North America, 256 Or. 151, 469 P.2d 766 (Or. 1970) en banc*................................................................30

*J&W Foods Corp. v. State Farm Mutual Auto Ins. Co., 723 So.2d 550 (Miss. 1998)*................................................................16

*Key Insurance Co. of South Carolina v. WW Tharp; 179 So.2d 555 (1965)*................................................................16

*Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)*................................................................14

*Leonard v. Nationwide Mutual Insurance Co., No. 06-61130 (5th Cir. filed August 30, 2007)*................................................................23, 24

*Matsushita Electric Industry Co. v. Zenith Radio Corp., 475 U.S. 574, 578 (1986)*................................................................13

*Munn v. National Fire Ins. Co. of Hartford, 237 Miss. 641 (Miss. 1959)*................................................................30

*Noxubee County School District v. United National Insurance Co., 883 So.2d 1159 (2004)*................................................................16

*Pakmark Corporation v. Liberty Mutual Insurance Co., 943 S.W.2d 256 (Mo.App. E.D. 1997)*................................................................23, 24

*Reliance Nat'l. Indem. Co. v. Lexington Ins. Co., No. 01 C 3369, 2002 U.S. Dist. LEXIS 20629 at *8 (N.D. Ill. 2002)*................................................................28

*Simon v. National Union First Ins. Co. of Pittsburgh, P.A., 782 N.E.2d 1125 (Mass. App. Ct. 2003)*................................................................28

*State Farm Mutual Auto Ins. Co. v. Universal Underwriters Ins. Co., 797 So.2d. 981 (Miss. 2001)*................................................................16

*Titan Indemnity Co. v. Estes, 825 So.2d 651 (2002)*................................................................16

*Viacom, Inc. v. Transit Cas. Co., 138 S.W.3d 723 (Mo. 2004)*................................................................14, 15

iv

## <u>INTRODUCTION</u>

This is an insurance coverage dispute over the nature, scope and amount of excess commercial property coverage provided by RSUI Policy No. NHD340601 ("RSUI Policy") and issued to Maxus Realty Trust, Inc. ("Maxus") for claimed damage to a property known as the Waverly Apartments ("Waverly") as a result of Hurricane Katrina.

The RSUI policy is excess to a primary policy of insurance issued by First Specialty Insurance Company ("FSIC Policy"). The FSIC policy provided $2,500,000 in coverage for which Maxus was charged approximately $30,000.00 in premium. Upon exhaustion of that policy, RSUI provided the next layer of coverage up to $189,417,773 in coverage for which they were charged approximately $71,010.00 in premium. The RSUI policy is subject to the same warranties, terms and conditions, and follows the form of the FSIC policy except as otherwise provided in the RSUI policy.

Being situated approximately 2 miles south of St. Louis Bay and two miles north of Mississippi Sound[1], Hurricane Katrina caused extensive flood damages to real and personal property located at the Waverly Apartments. Both the FSIC and the RSUI policies exclude coverage for loss or damage caused directly or indirectly by flood. "Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss." *See,* RSUI policy at Exhibit E, Item 3; FSIC policy at Exhibit D, Causes of Loss – Windstorm or Hail, Section B(1)(g). This language within the policy, commonly referred to as anti-concurrent causation language, unambiguously excludes coverage for flood damage even if another cause such as wind contributes concurrently or in any sequence to the loss. Thus, no recovery can be obtained for wind damage that occurs "concurrently or in any sequence" with

---

[1] See, deposition transcript of Neil Hall dated September 10, 2007 at pg. 19, annexed hereto as *Ex. H*.

1

the excluded water damage. In effect, the only category of hurricane-related damage covered under the RSUI policy is damage caused exclusively by wind. In this case, any property damaged exclusively by flood or by any combination of flood with Hurricane Katrina-generated winds, rain and/or storm surge is similarly excluded from coverage. Therefore, as a matter of law, RSUI is entitled to summary judgment in its favor on this issue and respectfully requests this Honorable Court find that any damages to the Waverly Apartments caused exclusively, concurrently or in any sequence of the loss, by flood, be excluded from coverage under the RSUI policy.

The FSIC and RSUI policies also contain an Occurrence Limit of Liability Endorsement. As set forth more fully below, the Occurrence Limit of Liability Endorsement expressly limits Maxus' recovery to the values set forth in the latest Statement of Values on file with RSUI which provides separate recoverable limits on a replacement cost basis for buildings and personal property at each of the 21 locations insured by and scheduled within, the RSUI policy. Each scheduled location sets forth the building's value on a replacement cost basis and limits Maxus' recovery for damages at the Waverly Apartments to the values declared by Maxus as set forth in the Statement of Values. As such, Maxus cannot recover in excess of the scheduled limit of liability for the damages to the Waverly Apartments. While Maxus may contend that the RSUI policy provides "blanket" protection and thereby seeks to recover in excess of the scheduled limit of liability for the Waverly Apartments, RSUI submits there are no genuine issues of material fact regarding the fact that RSUI follows form to the primary policy or the enforceability of the Occurrence Limit of Liability Endorsement upon which Maxus makes claim.

2

As a matter of law, RSUI is entitled to summary judgment in its favor and respectfully requests this Honorable Court find that (1) the RSUI policy is "scheduled," (2) the RSUI policy specifically states agreed values and individual recoverable limits for the specific buildings/structures and personal property at the Waverly Apartments, and (3) recovery for otherwise covered damage to buildings/structures and personal property at the Waverly Apartments is limited to 100% of the individually stated value for the Waverly Apartments.

To the extent Maxus sustained a covered loss resulting in physical damage, Maxus is not entitled to payment for such damage on a replacement cost ("RCV") basis as set forth in the schedule discussed above for the damages to the Waverly Apartments. As a condition precedent to recovery on a RCV basis, the damaged property must actually be repaired, rebuilt or replaced. Absent repairing, rebuilding or replacing the Waverly Apartments, Maxus is only entitled to the actual cash value ("ACV"). It is undisputed that Maxus has never undertaken or performed any repairs to the Waverly Apartments, and therefore, Maxus has not met the necessary condition to require payment on an RCV basis as required by the RSUI policy. As such, Maxus' recovery is limited to the ACV of the building value. Thus, as a matter of law, RSUI is entitled to summary judgment in its favor and respectfully requests this Honorable Court find that Maxus is only entitled to payment on an ACV basis for the damages to the Waverly Apartments.

Finally, RSUI is entitled, as a matter of law, to a set off for those amounts previously paid for damage sustained to the Waverly complex. Maxus was paid $2,500,000 by First Specialty for damages to two of their insured locations, the Arbor Gate Apartments and the Waverly Apartments. While the payment was made on an unallocated basis by First Specialty, Maxus acknowledged and allocated approximately $600,000.00 for the damages at Waverly. Additionally, Maxus made a claim under policies of flood insurance issued by Hartford Fire

3

Insurance Company ("Hartford") and was paid $4,250,000 for flood damages at the Waverly Apartments. RSUI is entitled to a set-off of these payments towards any payment made by RSUI in connection with the damages sustained at the Waverly Apartments. As such, of the $6,588,160 recoverable limit on a replacement cost basis, Maxus, by their own admission, has received $4,850,000 for the damages at Waverly. RSUI is entitled to a set-off of these prior payments made for damages at the Waverly. To hold otherwise would allow Maxus to seek and obtain a double recovery for the same loss and damage thus converting an indemnity policy to a policy of profit.

## I. STATEMENT OF UNCONTESTED FACTS

1.      Maxus is the owner of a property located at 100 Waverly Drive, Bay St. Louis, Mississippi known as the Waverly Apartments. See Complaint, Paragraph 5, which is annexed hereto as *Exhibit A*.

2.      The Waverly Apartments consists of 16 apartment buildings and a common clubhouse. See deposition transcript of Jim Steinle dated July 26, 2007, pg. 27, which is annexed hereto as *Exhibit B*; see also deposition transcript of Michael McRobert dated July 31, 2007, pgs. 25-26, which is annexed hereto as *Exhibit C*.

3.      There are 128 rental units within the 16 apartment buildings in the Waverly Apartments. *Ex. B,* pg. 29.

4.      First Specialty issued a commercial property insurance policy to Maxus bearing policy number FCP115002336300 with effective dates of September 1, 2004 and September 1, 2005 and limits of $2,500,000 per occurrence (the "FSIC policy") for properties owned by Maxus, including the Waverly Apartments. See FSIC policy, which is annexed hereto as *Exhibit D*.

4

5.    The FSIC policy provides coverage for physical loss or damage to covered property caused by "wind/hail" subject to certain exclusions. *Ex. D* at Building and Personal Property Coverage Form, Section A.

6.    The FSIC policy specifically excludes loss or damage caused by flood. Specifically, the FSIC policy states, in pertinent part, as follows:

CAUSES OF LOSS - WINDSTORM OR HAIL

B.    Exclusions

    1.    We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

        g.    Water

            1.    Flood surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

            2.    Mudslide or mudflow

            3.    Water that backs up or overflows from a sewer, drain or sump; or

            4.    Water under the ground surface pressing on, or flowing or seeping through:

                (a)    Foundations, walls, floors, or paved surfaces;

                (b)    Basements, whether paved or not; or

                 (c)    Doors, windows, or other openings.

***

(*Ex. D,* Causes of Loss - Windstorm or Hail Section B(1)(g)).

7.    The FSIC policy also contains an Occurrence Limit of Liability Endorsement (*Ex. D*, Endorsement No. SP 2 569 0203). Specifically, the FSIC policy states as follows:

5

# OCCURRENCE LIMIT OF LIABILITY ENDORSEMENT

It is understood and agreed that the following Special Terms and Conditions shall apply to this Policy:

1.      The Limit of Liability or Limit of Insurance shown on the Declarations Page of this Policy, or endorsed onto this Policy, is the Total Limit of the Company's Liability applicable to each occurrence from the perils insured in this Policy.  Notwithstanding any other Terms and Conditions of this Policy, in no event shall the Liability of the Company exceed the Limit of Liability or the Limit of Insurance shown on the Declarations Page, irrespective of the number of locations involved.

The term "occurrence" shall mean any one loss, disaster, or casualty or series of losses, disasters or casualties arising out of one event. When the term "occurrence" applies to a loss or a series of losses from the perils of tornado, cyclone, hurricane, windstorm, hail, flood, earthquake or fire ensuing therefrom, volcanic eruption, riot, riot attending a strike, civil commotion or vandalism and malicious mischief, one event shall be construed to include all losses arising during a continuous period of 72 hours.  when filing a written proof of loss, the Insured may elect the moment at which time the 72 hour period shall be demented to have commenced, which period shall not be deemed to have commenced earlier than:

  a.      The time that the first loss to any covered property   occurred, or

  b.      Prior to the effective date of this Policy.

2.      The premium for this Policy is based upon the Statement of Values on file with the Company, or attached to this Policy.   In the event of a loss hereunder, the Liability of the Company, subject to the Terms of Paragraph 1., above, shall be limited to the lesser of the following:

  a.      The actual adjusted amount of the loss, less applicable deductible (s); or
  b.      One Hundred Percent (100%) of the individually stated value for each scheduled item of property insured as shown on the latest Statement of Values on file with the Company, or attached to this Policy, less applicable deduction(s); or

  c.      The Limit of Liability or Limit of Insurance shown on the

Declarations Page of this Policy or endorsed onto this Policy.

***

8.      The FSIC policy contains a Valuation provision.  *Ex. D.*  Specifically, the FSIC

policy states as follows:

**BUILDING AND PERSONAL PROPERTY COVERAGE FORM**

**E.  Loss Conditions**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.
* * *
**7.  Valuation**
We will determine the value of Covered Property in the event of loss or damage as follows:
a.  At actual cash value as of the time of loss or damage, except as provided in b., c., d. and e., below.
* * *

9.      The FSIC policy contains a Replacement Cost provision.      *Ex. D.*

Specifically, the FSIC policy states as follows:

**G.      Optional Coverages**

**3.      Replacement Cost**

a.      Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, of this Coverage Form.
***
d.      We will not pay on a replacement cost basis for any loss or damage:

(1)      Until the lost or damaged property is actually repaired or replaced; and
(2)      Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

***
e.      We will not pay more for loss or damage on a replacement cost basis than the least of (1), (2) or (3), subject to f. below:

7

       (1)      The Limit of Insurance applicable to the lost or damaged property;

       (2)      The cost to replace the lost or damaged property with other property;

             (a)      of comparable material and quality; and

             (b)      Used for the same purpose; or

       (3)      The amount actually spent that is necessary to repair or replace the lost or damaged property.

\*\*\*

      f.      The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of the property.

\*\*\*

10.     Coverage is provided under the FSIC policy on a replacement cost value basis provided the insured actually repairs and/or replaces the damaged property within a reasonable time after the loss.  (*Ex. D,* Schedule of Coverages - Endorsement).  If no repairs are undertaken, recovery is limited to actual cash value.  Replacement cost coverage will not be provided unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.  Maxus has never repaired or replaced the damaged property.  *Ex. D,* Building and Personal Property Coverage Form Section G(3); *Ex. B,* pg. 45; *Ex. C,* pg. 41.

11.     RSUI provides coverage to Maxus in excess of the FSIC policy for all risks excluding Flood and Earthquake under policy number NHD340601 with effective dates of May 3, 2005 to May 3, 2006 ("the RSUI Policy") and limits up to $189,417,773.  See the RSUI policy, which is annexed hereto as *Exhibit E*.

12.     The RSUI Policy provides as follows:

**EXCESS PHYSICAL DAMAGE COVERAGE FORM**

**1.     Insuring Clause:**

Subject to the limitations, terms and conditions contained in this Policy or added hereto, the Company agrees to indemnify the Insured named in the schedule herein in respect of direct physical loss or damage to the property described in the schedule while located or

8

contained as described in the schedule, occurring during the period stated in the schedule and caused by any of such perils as set forth in Item 3 of the schedule, and which are also covered by and defined in the policy(ies) specified in the schedule and issued by the "Primary Insurer(s)" stated therein.

## 2.    LIMIT:

Provided always that liability attaches to the Company only after the primary and underlying excess insurer(s) have paid or have admitted liability for the full amount of their respective ultimate net loss liability as set forth in the Item 6 of the schedule and designated "Primary and Underlying Excess Limit(s)" and then the limits of the Company's liability for the full amount of such "Limit Insured".

## 4.    APPLICATION OF RECOVERIES:

All salvages, recoveries or payments recovered  or received subsequent to a loss settlement under this Policy shall be applied as if recovered or received prior to such settlement and all necessary adjustments shall then be made between the Insured and the Company; provided always that nothing in this Policy shall be construed to mean that losses under this Policy are not recoverable until the Insured's ultimate net loss has been fully ascertained.

## 5.    MAINTENANCE OF PRIMARY INSURANCE

In respect of the perils hereby insured against, this Policy is subject to the same warranties, terms and conditions (except as regards the premium, the amount and limits of liability other than the deductible or self-insurance provision where applicable, and the renewal agreement, if any; and EXCEPT AS OTHERWISE PROVIDED HEREIN) as are contained in or as may be added to the policy(ies) of the primary insurer(s) prior to the happening of a loss for which claim is made hereunder, and should any alteration be made in the premium for the policy(ies) of the primary insurer(s), then the premium hereon shall be adjusted accordingly.

(*Ex. E,* Excess Physical Damage Coverage Form).

***

13.    The RSUI policy is subject to the same warranties, terms and conditions as the FSIC policy except as regards the premium (FSIC charged approximately $30,000 in premium

9

whereas RSUI charged approximately $71,010), the amount and limits of liability other than the deductible or self-insurance provision where applicable, and the renewal agreement, if any; and except as otherwise provided in the RSUI policy. *Ex. E.*

      14.     The RSUI policy excludes flood. Specifically, the RSUI policy states as follows:

### EXCESS PHYSICAL DAMAGE COVERAGE FORM

      3.     Perils Covered:     All Risk Excluding Flood and Earthquake

           ***

(*Ex. E,* Excess Physical Damage Coverage Form).

      15.     The Statement of Values on file with RSUI lists the replacement cost value for buildings at the Waverly Apartments as $6,588,160. See the Statement of Values maintained by RSUI for Maxus' properties, which is annexed hereto as *Exhibit F*.

      16.     Both the FSIC and RSUI policies are scheduled policies. See deposition transcript of Timothy Presko dated October 5, 2007, pgs. 81-82, which is annexed hereto as *Exhibit O*.

      17.     On August 29, 2005, Hurricane Katrina caused wind and flood damage to buildings and personal property at the Waverly Apartments. See the report of Jonathan Milton dated March 3, 2006, which is annexed hereto as *Exhibit G*.

      18.     All of the 17 buildings at the Waverly Apartments sustained flood damages during Hurricane Katrina. See deposition transcript of Neil B. Hall dated September 10, 2007, pg. 39, which is annexed hereto as *Exhibit H*.

      19.     All of the first story units and the clubhouse at the Waverly Apartments sustained flood damage. *Ex. H,* pg. 82.

20.     There was flood damage to a measured height of 4-5 feet on the second story units in all of the buildings at the Waverly Apartments as a result of Hurricane Katrina.  See the report of Neil B. Hall & Associates, LLC dated April 30, 2007, which is annexed hereto as *Exhibit I*.

21.     Flood is an excluded peril under both the FSIC and RSUI policies (*Ex. D,* Causes of Loss - Windstorm or Hail, B(1)(g)).

22.     According to Mr. Neil Hall, Maxus' designated engineer expert, storm surge from Hurricane Katrina damaged buildings to a height of approximately 4-5 feet above the second story elevation.  *Ex. I.*  Maxus' designated construction expert, Mr. David Dye, also recognized that there was three feet of water on the second floor and everything below the water line on the second floor of the buildings was submerged under water at some point in time.  See the deposition transcript of David Dye dated September 18, 2007 at pgs. 60-61, which is annexed hereto as *Exhibit J.*  Virtually all witnesses and experts concurred with this finding.

23.     Maxus retained Flagship Reconstruction Services to obtain an estimate of the loss for wind damages at the Waverly Apartments.  See the deposition transcript of Cliff Chadwell dated September 7, 2007, pg. 20, which is annexed hereto as *Exhibit K*; see also, the deposition transcript of John Alvey dated September 20, 2007, pg. 55, which is annexed hereto as *Exhibit L.*

24.     Flagship ultimately provided an estimate of $6,750,234 for damages associated with wind.  See the letter from Cliff Chadwell of Flagship Services Group to Maxus dated December 16, 2005, which is annexed hereto as *Exhibit M*; see also, *Ex. C,* pgs. 153-154.

25.     For the purposes of this litigation, Maxus subsequently hired and designated David Dye as their construction expert.  David Dye similarly excluded first floor damage due to flooding at the direction of Maxus.  *Ex. J* at pgs. 68-69.

26.     In formulating their estimate, Flagship excluded the first floor units from consideration at the direction of Maxus' counsel, Lathrop & Gage, LLP, as these units were deemed to be damaged by flood.  See e-mail communication dated December 12, 2005 from Stacey Andreas to Jim Steinle, which was annexed as Exhibit 5 at the deposition of Cliff Chadwell dated September 7, 2007 and is annexed hereto as *Exhibit N*.

27.     Hartford provided coverage to Maxus for the peril of flood under 17 separate policies of insurance for the 17 buildings which comprise the Waverly Apartments.  *Ex. O*, pg. 65.

28.     Hartford provided coverage to Maxus for each building with limits of $250,000 per occurrence caused by the peril of flood.  *Ex. O*, pg. 66.

29.     Hartford performed an investigation of the damages at the Waverly Apartments on September 22, 2005.  See copy of excerpt from report of Frances Lyon on behalf of Hartford, which is annexed hereto as *Exhibit P*.

30.     Hartford paid their policy limits of $250,000 for each of the 17 buildings at the Waverly Apartments.   See the copies of the Proofs of Loss, which are annexed hereto as *Exhibit Q*; see also, Ex. C, pg. 174.

31.     In sum, Hartford made total payments to Maxus for the damages caused by flood at the Waverly Apartments in the amount of approximately $4,250,000.  *Ex. Q*.

32.     First Specialty also paid $2,500,000 to Maxus, representing payment of full policy limits.  *Ex. C,* pg. 171.

33.     The payments made by First Specialty were allocated for damages to two locations - the Waverly Apartments and another Maxus property known as the Arbor Gate Apartments, which is located in Mississippi.  *Ex. C*, pgs. 171-172.

34.     Approximately $1,900,000 of the First Specialty payment was allocated to the loss at the Arbor Gate Apartments. *Ex. C*, pgs. 171-172.

35.     The remainder of the First Specialty payment to Maxus - approximately $600,000 - was allocated to wind damages at the Waverly. *Ex. C*, pg. 172.

36.     On May 31, 2006, Maxus forwarded their claim submission for the Waverly Apartments to RSUI.  See the cover letter to Maxus' claim submission from DeAnn Duffield dated May 31, 2006, which is annexed hereto as *Exhibit R*.

37.     On September 7, 2006, Maxus filed suit in the United States District Court for the Western District of Missouri against RSUI, seeking to recover damages allegedly sustained at the Waverly Apartments. *Ex. A*.

38.     On October 19, 2006, RSUI paid $344,557.11 to Maxus, representing the undisputed portion of Maxus' claim for wind damages at the Waverly Apartments.  See the letter from counsel dated October 19, 2006 and the check in the amount of $344,557.11 to Maxus, which is annexed hereto as *Exhibit S*; see also, *Ex. C,* pgs. 106-107.

## II. LAW AND ARGUMENT

### A.     Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is proper when the moving party shows that there is no genuine issue of material facts and that it is entitled to judgment as a matter of law. *See,* Fed. R. Civ. P. 56 (c); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).  Summary judgment is appropriate "[w]here the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *See, Matsushita Electric Industry Co. v. Zenith Radio Corp.,* 475 U.S. 574, 578 (1986); *Federal Savings & Loan Insurance v. Kralj,* 968 F.2d 500, 503 (5th Cir. 1992).  Although the

facts are reviewed drawing all reasonable inferences in favor of the non-moving party, summary judgment is mandated against a party who fails to make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial. *See, Celotex* at 322.

      **B.**      **Choice of Law**

      In diversity cases such as the one at bar, federal courts must apply state substantive law. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78; *Ashland Chem. Inc. v. Barco Inc.,* 123 F.3d 261, 265 (5th Cir. 1997). In determining which state's substantive law controls, the court applies the choice-of-law of the forum state. *See, Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941). Accordingly, a Missouri federal court applies Missouri's choice-of-law rules. Missouri courts determine which state's law controls by examining which state has the most significant relationship to the lawsuit using the factors set forth in the Restatement (Second) of Conflict of Laws Sections 188 and 193. *See, e.g., Viacom, Inc. v. Transit Cas. Co.*, 138 S.W.3d 723, 725 (Mo. 2004); *Egnotic v. Nguyen*, 113 S.W. 3d 659, 665 (Mo. App. W.D. 2003).

      Section 188 provides that the law of the state with the most significant relationship to the transaction and parties governs. *Restatement (Second) of Conflict of Laws section 188(1).* It also provides what contacts are considered: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation, and place of business of the parties." *Restatement (Second) of Conflict of Laws section 188(2).*

      Section 193 states that the "validity of … [the] insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy …." By that section's comment b, the

location of the insured risk is given greater weight than any other single contact in determining which state's law controls, although less weight when the policy covers a group of risks scattered throughout two or more states. *Viacom, Inc.*, *supra*. *See also Collins v. State Farm Mut. Auto Ins.*, 902 F.2d 1371, 1372 (8th Cir. 1990) (recognizing Missouri courts apply the Restatement (Second) of Conflict of Laws).

The case of *Crown Center Redevelopment Corp. v. Occidental Fire & Cas. Co. of North Carolina* is particularly insightful. In *Crown Center*, the Missouri Court of Appeals for the Western District found Missouri law governed a policy insuring hotels in twenty-eight different states when an accident occurred at an insured hotel in Missouri. *Crown Center*, *supra*. Columbia, an Illinois insurer, issued an excess policy to Hyatt, an Illinois corporation operating hotels in twenty-eight states. Hyatt's coverage included twenty different policies for five levels of excess in two primary lines of insurance. *Id.* at 351-52. At issue were insurance claims resulting from a mass casualty at a Missouri Hyatt hotel. The Court cited the Restatement and held Missouri law controlled because the insured risk was located in Missouri. *Id.* at 358-59. Columbia argued Missouri courts placed primary importance on the place of contracting in determining choice of law. *Id.* The Court rejected this argument, based not only on the Restatement (Second) factors, but also on the fact that, because the hotel was covered by multiple policies, applying the law of the place of contracting would force the court to apply the laws of multiple states to determine the coverage on the hotel. *Id.* at 359.

Accordingly, Missouri courts consistently apply the law of the location of the insured risk when such a location exists. In cases where multiple locations in multiple states are insured, the location where the damage occurred which gives rise to the insurance dispute will control.

15

The present case is analogous to the ruling in *Crown Center*. As in *Crown Center*, the RSUI policy here covers specific locations. The Waverly Apartments is located in Mississippi. Section 193 of the Restatement (Second) and *Crown Center* clearly stand for the proposition that the location of the insured risk is the most important factor. When the risk insured exists in an identifiable location, Missouri courts consistently hold the law of that location governs. Thus, Mississippi law governs here.

**C.**      **Unambiguous policy provisions will be enforced as written.**

Mississippi law is consistent with the laws of other states regarding the interpretation of insurance policy terms and determining whether there is an ambiguity. An insurance policy is a contract between the insured and the insurer and has the force and effect of law between the parties. *State Farm Mutual Auto Ins. Co. v. Universal Underwriters Ins. Co.*, 797 So.2d. 981 (Miss. 2001). If an insurance contract is in plain and unambiguous language, it should be construed as written in the same way as any other contract. *Key Insurance Co. of South Carolina v. WW Tharp*; 179 So.2d 555 (1965); *Employers Mutual Casualty Co. v. Nosser*, 250 So.2d 542 (1964). Courts will not recognize a strained interpretation of an insurance policy. *Titan Indemnity Co. v. Estes*, 825 So.2d 651 (2002). Where the words of an insurance policy are plain and unambiguous, courts will afford them their plain, ordinary meaning and will apply them as written. *Noxubee County School District v. United National Insurance Co.*, 883 So.2d 1159 (2004).

Clear and unambiguous provisions in an insurance contract that limit liability must be given effect. *See, J&W Foods Corp. v. State Farm Mutual Auto Ins. Co.*, 723 So.2d 550 (Miss. 1998). Insurers are entitled to limit their liability under a policy of insurance and impose

reasonable conditions upon the obligations they have assumed in a policy, so long as there is no conflict with the law or public policy. *Caldwell Freight Lines, Inc. v. Lumbermens Mutual Ins. Co., Inc.*, 947 So.2d 948 (Miss. 2007).

>    **D.    There is no coverage for any damages to the Waverly Apartments caused by flood or by any combination of flood and Hurricane Katrina generated wind, rain and/or storm surge.**

It is uncontested that Hurricane Katrina caused flood damages to Maxus' real and personal property located at the Waverly Apartments. It is also uncontested that the policy excludes damages caused by flood. Specifically, the policy provides as follows:

CAUSES OF LOSS - WINDSTORM OR HAIL

B.    Exclusions

>    1.    We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

>>    g.    Water
>>    1.    Flood surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;
>>    2.    Mudslide or mudflow
>>    3.    Water that backs up or overflows from a sewer, drain or sump; or
>>    4.    Water under the ground surface pressing on, or flowing or seeping through:
>>>    (a)    Foundations, walls, floors, or paved surfaces;
>>>    (b)    Basements, whether paved or not; or
>>>    (c)    Doors, windows, or other openings.
>>>    ***

(*Ex. D*, Causes of Loss - Windstorm or Hail Section B(1)(g)).

The RSUI policy follows form and excludes flood, stating as follows:

**EXCESS PHYSICAL DAMAGE COVERAGE FORM**

>    3.    Perils Covered:    All Risk Excluding Flood and Earthquake

17

***

(*Ex. E*, Excess Physical Damage Coverage Form).

It is also undisputed that all of the buildings at the Waverly Apartments sustained flood damages during Hurricane Katrina.  *Ex. H*, pg. 39.  Virtually all witnesses, both expert or otherwise, for plaintiff or defendant, concluded that there were clear water lines throughout the interior of the second floors of the buildings.  *Ex. C* at pgs. 157-158, 161-162; *Ex. G*; *Ex. I*; *Ex. J* at pgs. 59, 60-61; *Ex. K* at pg. 47.  Maxus' designated expert engineer states in his report that storm surge from Hurricane Katrina damaged buildings to a height of approximately 4-5 feet above the second story elevation.  *Ex. I*.  Maxus' expert engineer also concluded that the first floors were damaged by flood.  *Ex. H* at pgs. 82, 193-194.  In fact, all of the first story units and the clubhouse in the Waverly Apartments sustained flood damage.  *Ex. H* at pg. 82.  Maxus conceded that everything situated below the water line was submerged under water at some point in time.  *Ex. C* at pg. 158; *Ex. K* at pgs. 47-49; *Ex. J* at pgs. 60-61.  Maxus has never submitted a claim to RSUI for the interior of the first floor and no question of fact exists that the interior of the first floors of Waverly were damaged by flood, an excluded peril. These facts are undisputed.

In or about November, 2005, Maxus retained Cliff Chadwell of Flagship Services Group to prepare an estimate which ultimately formed the basis of their property damage claim submitted to RSUI on May 31, 2006.  *Ex. K* at pg. 30; *Ex. C* at pgs. 114, 121, 132 and 136; See deposition transcript of DeAnn Totta dated July 30, 2007 at pgs. 54-55, which is annexed hereto as *Exhibit T*; See also, excerpts from Maxus' claim submission dated May 31, 2006, which is annexed hereto as *Exhibit V*.  Flagship was directed to develop a scope for the entire second floor of the properties, excluding the first floors from consideration.  *Ex. K* at pgs. 41-44; *Ex. C* at pg. 146.  Flagship's inspection and resultant estimate were performed, prepared and completed by

18

November 2005, after which Mr. Chadwell subsequently issued a narrative report which stated as follows:

> No consideration or cost estimates were given for 1st floor units, floor trusses, sub flooring, light weight concrete or any site work arguably related to flooding as opposed to wind damage. ***We have priced repairs as a result of wind damage only and no part of this cost estimate includes flood damage***.

 See *Ex. K* at pgs. 39-40, 45-46, 54, 134; see also *Ex. V*.

Maxus's submitted their claim for wind in the amount of $6,075,234 - the exact amount set forth in Flagship's estimate attached to the December 16, 2005 narrative report. *Ex. V*. Maxus' Secretary, DeAnn Totta testified that the Flagship report and estimate was used as the basis of Maxus' claim for wind damage only. *Ex. T* at pgs. 54, 59-60. Maxus' Chief Executive Officer and President/Director Michael McRobert testified that it would be reasonable for RSUI to rely upon the Maxus claim submission, inclusive of the Flagship report, in their consideration of whether or not to pay the damage as claimed. *Ex. C* at pg. 136.

All parties agreed that the waters from the flood rose approximately four feet into the second story. By including the entire second floor in its claim submission, Maxus improperly includes and seeks recovery for excluded flood damage in their claim. In other words, Maxus improperly seeks coverage for that damage which was submerged below the uncontested waterline within the second floor interiors. Both of Maxus' contractors, Flagship and designated construction expert, David Dye, measured and included in their respective estimates all interior second floor damage from floor to the ceiling without giving any consideration as to what was wind damage or what was flood damage within the second floor. *Ex. K* at pg. 44; *Ex. J* at pg. 60-61. In doing so, Maxus' claim, as submitted, improperly seeks recovery for excluded flood damage within the second floor under the established four foot water line.

Flagship never made a distinction between wind and flood in their estimate. *Ex. K* at pg. 44. Flagship was never requested to distinguish between damage caused by wind as opposed to flood. *Ex. K* at pg. 55. Chadwell testified that he could not identify that damage which resulted exclusively from wind and nothing else. *Ex. K* at pgs. 89-90. Additionally, both Chadwell and Dye testified that their estimate would have been different if he measured solely from the water line upward. *Ex. K* at pgs. 105-107; *Ex. J* at 64-69. Mr. Chadwell testified that during his inspection, it was obvious that "flood waters had exceeded the floor level on the first and second floor" and that to the extent any items were below the waters lines situated approximately 4-5 feet within the second floor of those apartments, those items would have been submerged under water. *Ex. K* at pgs. at 44, 47; *Ex. C* at pgs. 158, 161, 177-178.

While Flagship's report is purportedly an estimate for wind damage only, Chadwell's deposition revealed that he made no such distinction at any time. He included virtually all damage in his estimate. In actuality, it was plaintiff's counsel who emailed Chadwell on December 12, 2005, requesting to insert that sentence that ultimately appeared in his report that stated "*...arguably related to flooding as opposed to wind damage. We have priced repairs as a result of wind damage only and no part of this cost estimate includes flood damage.*" See *Ex. N*. Chadwell's report, as it originally was drafted contained no such language, however, he added that sentence at counsel's request. *Ex. K* at pgs. 56-57. Also, Maxus' Director of Construction, James Steinle, emailed Chadwell before the Flagship report was issued stating "*... the letter should note that the Scope is Wind Damage only and that you took great pains to separate anything that was Flood Damage.*" See also, Exhibit 8 from the deposition of Cliff Chadwell on September 7, 2007, which is annexed hereto as *Exhibit U*. While counsel may have requested Chadwell to insert the limiting language, Flagship's scope and estimate as submitted to RSUI

nevertheless contained flood damage. *Ex. K* at pg. 123. Mr. Chadwell testified and conceded that his estimate includes all damages observed on the second floor regardless of the cause of loss, that he made no distinction between wind and flood damages and he did not exclude from consideration flooding and flood damage. *Ex. K* at pgs. 44-45; *Ex. K* at pg. at 123. As such, by including the entire second floor in the claim, Maxus improperly seek recovery for significant flood damage which existed well below the uncontested water line for which there is no coverage under the RSUI policy.

Maxus subsequently retained David Dye to serve as a construction expert in these proceedings. Maxus' construction expert similarly excluded the interior first floor from his wind estimate stating that he considered the first floor to be flood damaged. *Ex. J* at pgs. 68-69. Further, Maxus directed Dye to only include the second floor in the estimate prepared in connection with this litigation. *Ex. J* at pgs. 68-69. This was the identical direction Maxus gave Flagship in preparing his estimate for the insurance claim submission. As Maxus' expert contractor, David Dye, similarly measured the Waverly loss on the second floors in the same manner and from floor to ceiling, both Chadwell and Dye improperly included flood damage in their estimates used in the original Maxus claim submission and purportedly to be demonstrated at time of trial, respectively. Damaged caused flood occurring independently or in any combination with Hurricane Katrina winds, rain and/or storm surge is excluded under the policy.

By including the entire second floor in their estimate from floor to ceiling, Plaintiff's claim for purported "wind damages only" improperly includes the 4-5 feet of the second floor which was similarly flooded with the first floors. Without any evidence to the contrary, plaintiffs have no facts to show that the storm surge of approximately 14 feet damaged all of the first floors sufficiently to receive the full limits ($4,250,000.00) of flood coverage and

simultaneously contend that the top 4 feet of the same storm surge was exclusively caused by wind to maximize their coverage under their wind policies. A singular surge is not so easily divided. For these reasons and those set forth below, defendants are entitled to judgment that all loss or damage up to and including the established water mark/lines were caused by the peril of flood and are therefore excluded from coverage under the RSUI policy. Additionally, summary judgment must be granted to defendants where, as here, wind and water synergistically caused the same damage and therefore is excluded under the policy's flood exclusion which contains anti concurrent causation language as further discussed below.

The RSUI policy excludes that loss or damage caused by the peril of flood. It also excludes, however, that damage caused by flood and any combination of Hurricane winds, rain and/or storm surge. The FSIC policy, to which the RSUI policy follows the form, contains anti-concurrent causation language in Section B(1) above, which excludes coverage regardless of any other cause or event that contributes concurrently or in any sequence to the loss. Thus, there is no coverage for loss or damage to the Waverly Apartments caused either exclusively by flood or by any combination of winds and rain occurring in sequence or concurrently with Hurricane Katrina-generated storm surge. Specifically, the provision states as follows:

<u>CAUSES OF LOSS - WINDSTORM OR HAIL</u>

B.     Exclusions

      1.     We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

                        ***

Courts in Mississippi and Missouri will enforce "anti-concurrent causation" provisions that preclude coverage for losses caused directly or indirectly by an excluded event "*regardless*

Case 4:06-cv-00750-ODS    Document 76    Filed 10/19/07    Page 26 of 39

*of any other cause or event that contributes concurrently or in any sequence to the loss*."

*Leonard v. Nationwide Mutual Insurance Co.,* No. 06-61130 (5th Cir. filed August 30, 2007);

*Pakmark Corporation v. Liberty Mutual Insurance Co.*, 943 S.W.2d 256 (Mo.App. E.D. 1997).

Under an "all risk" policy of insurance which contains such a provision, the insurer has the

burden to prove the affirmative defense of whether the damage to insured property was excluded

by provisions in the policy.  *Leonard, supra.*   Courts in Mississippi and Missouri have found

"anti-concurrent causation" provisions to be clear and unambiguous and will enforce the

provision when two or more events combine to cause a loss, and one of those events is excluded

by the policy.  *Leonard, supra*; *Pakmark, supra.*

In *Leonard*, a homeowner's policy coverage dispute arose from the damage caused by

Hurricane Katrina along the Mississippi Gulf Coast.  The insured home in that case was damaged

by torrential rain and sustained winds in excess of 100 mph.  By midday, the storm had driven

ashore a tidal wave, or storm surge, that flooded the ground floor of the Insured's two story

home.  The applicable policy in that case excluded flood and also contained anti-concurrent

causation language like the policy here.  The Fifth Circuit Court of Appeals held that the

insurer's anti-concurrent causation clause unambiguously excluded coverage for "water damage

'even if another peril' - e.g., wind - contributed concurrently or in any sequence to cause the

loss."  *Leonard*, *supra.*  Moreover, in reversing the District Court, the Fifth Circuit identified

three discrete categories at issue: (1) damage caused exclusively by wind; (2) damage caused

exclusively by water; and (3) damage caused by wind "concurrently" or "in any sequence" with

water."  *Leonard* at 14.  The Court then held as follows:

> …The only species of damage covered under the policy is damage caused
> <u>exclusively</u> by wind.  But if wind and water synergistically caused the
> <u>same</u> damage, such damage is excluded…If, for example, a policyholder's
> roof is blown off in a storm, and rain enters through the opening, the

23

> damage is covered. Only if storm-surge flooding - an excluded peril - then inundates the same area that the rain damaged is the ensuing loss excluded because the loss was caused concurrently or in sequence by the action of a covered and an excluded peril.

*Leonard*, *supra*.

In *Pakmark Corporation v. Liberty Mutual Insurance Co.*, 943 S.W.2d 256 (Mo.App. E.D. 1997), the policy at issue contained a flood exclusion. However, the insured claimed that the loss was the result of a combination of flood and sewer backup, which was a covered peril. After finding that the policy unambiguously excluded coverage for loss caused directly or indirectly by flooding regardless of any other cause of loss that contributed concurrently or in any sequence to the insured's loss, the Missouri Court of Appeals in the Eastern District upheld the trial court's holding in favor of the insurer and granted their motion for summary judgment. *Pakmark, supra*.

Pursuant to the above rulings, Maxus cannot obtain a recovery for wind damages that occurred "concurrently or in any sequence" with the excluded water damage. *See, Leonard* at p. 15. In effect, the only category of hurricane-related damage covered under the RSUI policy is damage caused exclusively by wind. *See, Id.* at 14. In this case, any property damaged exclusively by flood or by any combination of flood and Hurricane Katrina-generated winds and rain which is also inundated by Hurricane Katrina-generated storm surge is excluded from coverage under the authority of *Leonard. Id.* at 15.

Therefore, as a matter of law, RSUI is entitled to summary judgment in its favor and respectfully requests this Honorable Court find that any damages to the Waverly Apartments caused exclusively, concurrently or in any sequence, by flood damage below the established 4-5 foot water line within the second floors of the property, be excluded from coverage under the RSUI policy.

24

**E.     The Occurrence Limit of Liability Endorsement unequivocally limits coverage for the Waverly Apartments to the values contained in the Statement of Values.**

The Occurrence Limit Liability Endorsement in the policy and Schedule of Values limit the coverage at the Waverly Apartments. The policy documents are straightforward. The RSUI policy follows form to the FSIC primary policy and is therefore subject to the same warranties, terms and conditions. Maxus' insurance agent, Mr. Tim Presko, owner of Tim Presko Insurance Agency and certified property underwriter, conceded that the RSUI policy follows the FSIC form and that the RSUI policy similarly follows the Occurrence Limit of Liability provision contained in the FSIC policy. *Ex. O* at pg. 79. The FSIC policy, which the RSUI policy follows form to, excludes coverage for loss or damage caused by flood. Specifically, the RSUI policy provides, in relevant part, as follows:

<u>**EXCESS PHYSICAL DAMAGE COVERAGE FORM**</u>

1.     **INSURING CLAUSE:**

> Subject to the limitations, terms and conditions contained in this Policy or added hereto, the Company agrees to indemnify the Insured named in the schedule herein in respect of direct physical loss or damage to the property described in the schedule while located or contained as described in the schedule, occurring during the period stated in the schedule and caused by any of such perils as are set forth in Item 3 of the schedule, and which are also covered by and defined in the policy(ies) specified in the schedule and issued by the "Primary Insurer(s)" stated therein.

*     *     *

**5.     MAINTENANCE OF PRIMARY INSURANCE**

In respect of the perils hereby insured against, this Policy is subject to the same warranties, terms and conditions (except as regards the premium, the amount and limits of liability other than the deductible or self-insurance provision where applicable, and the renewal agreement, if any; and EXCEPT AS OTHERWISE PROVIDED HEREIN) as are contained in or as may be added to the policy(ies) of the primary insurer(s) prior to the happening of a loss for which claim is made hereunder, and should any alteration be made in the premium for the policy(ies) of the primary insurer(s), then the premium hereon shall be adjusted accordingly.

See, *Ex. E* at Excess Physical Damage Coverage Form.

Thus, the RSUI policy is subject to the Occurrence Limit of Liability Endorsement in the

FSIC Primary Policy. This Endorsement states as follows:

<u>**OCCURRENCE LIMIT OF LIABILITY ENDORSEMENT**</u>

It is understood and agreed that the following Special Terms and Conditions shall apply to this Policy:

1.     The Limit of Liability or Limit of Insurance shown on the Declarations Page of this Policy, or endorsed onto this Policy, is the Total Limit of the Company's Liability applicable to each occurrence from the perils insured in this Policy. Notwithstanding any other Terms and Conditions of this Policy, in no event shall the Liability of the Company exceed the Limit of Liability or the Limit of Insurance shown on the Declarations Page, irrespective of the number of locations involved.

The term "occurrence" shall mean any one loss, disaster, or casualty or series of losses, disasters or casualties arising out of one event. When the term "occurrence" applies to a loss or a series of losses from the perils of tornado, cyclone, hurricane, windstorm, hail, flood, earthquake or fire ensuing therefrom, volcanic eruption, riot, riot attending a strike, civil commotion or vandalism and malicious mischief, one event shall be construed to include all losses arising during a continuous period of 72 hours. when filing a written proof of loss, the Insured may elect the moment at which time the 72 hour period shall be demented to have commenced, which period shall not be deemed to have commenced earlier than:

a.    The time that the first loss to any covered property  occurred, or
b.    Prior to the effective date of this Policy.

2.     The premium for this Policy is based upon the Statement of Values on file with the Company, or attached to this Policy. In the event of a loss hereunder, the Liability of the Company, subject to the Terms of Paragraph 1., above, shall be limited to the lesser of the following:

a.    The actual adjusted amount of the loss, less applicable deductible (s); or
b.    One Hundred Percent (100%) of the individually stated value for each scheduled item of property insured as shown on the latest Statement of Values on file with the Company, or attached to this Policy, less applicable deduction(s); or
c.    The Limit of Liability or Limit of Insurance shown on the Declarations Page of this Policy or endorsed onto this Policy.

\*      \*      \*

See, *Ex. D*, Endorsement No. SP 2 569 0203.

26

On or about April 20, 2005 and in conjunction with Maxus' request to add the Waverly Apartments location to the schedule of properties insured, specific values for buildings and personal property located at the Waverly Apartments were declared by or on behalf of Maxus and submitted to RSUI for attachment to the Property Schedule. *Ex. F.* By Endorsement No. 2, the specific property items at the Waverly Apartments location were added to the RSUI policy with the revised limit insured. *Ex. E* at Endorsement 2. The Statement of Values on file with RSUI lists the replacement cost value for buildings at the Waverly Apartments as $6,588,160. *Ex. F*.

The Statement of Values, along with the stated values for the Waverly Apartments added to the Policy by Endorsement No. 2, constitute the latest Statement of Values on file with RSUI prior to Hurricane Katrina. The scheduled values of the specific "on file" property items damaged by Hurricane Katrina for which Maxus makes claim under the RSUI policy are as follows:

| Loc # | Street Address | City/St/Zip | Complex | Bldg Value | Loc Total Value |
|---|---|---|---|---|---|
| 18 | 100 Waverly Drive | Bay St. Louis, MS 39520 | Waverly | $ 6,588,160 | $ 7,533,160 |

*Ex. F* at Location 18; *Ex. E* at Endorsement 2.

The Occurrence Limit of Liability Endorsement expressly limits Maxus' recovery to the Statement of Values on file for the Waverly Apartments building value of $6,588,160.00. Courts have interpreted similar limitations to equate to "scheduled," not "blanket" coverage as a matter of law. *See, Fair Grounds Corp. v. Travelers Indemnity Company of Illinois,* 742 So2d. 1069

(La.App. 5 Cir. 1999); *Reliance Nat'l. Indem. Co. v. Lexington Ins. Co.,* No. 01 C 3369, 2002

U.S. Dist. LEXIS 20629 at *8 (N.D. Ill. 2002) (policy reference to "per occurrence" limits was

further qualified by the Occurrence Limit of Liability endorsement, Agreed Amount

endorsement and the Schedule of Covered Locations, all of which referred to the Statement of

Values on file with Lexington so as to render coverage on a scheduled, not blanket basis);

*Anderson Mattress Co. Inc., v. First State Ins. Co.,* 617 N.E.2d 932,934 (Ind. Ct. App. 1993)

(schedule of property values established limits of liability for each specific piece of property

comprising the business and not "blanket" coverage for the business as a whole); *Simon v.*

*National Union First Ins. Co. of Pittsburgh, P.A.,* 782 N.E.2d 1125 (Mass. App. Ct. 2003) (no

"blanket" coverage for one property item not listed in the statement of values submitted to

insurer).

      In *Fair Grounds*, the insured sustained damage to a grandstand, one of 66 items of

property listed on a schedule of values on file with the insurer. At the time of loss, the values of

all 66 property items totaled $34 million. The value of the grandstand appearing on the schedule

of values provided by the insured's broker was $16.6 million. The insured claimed an insurable

loss to the grandstand in excess of $34 million against primary and excess policies of insurance.

The primary policy issued to *Fair Grounds* contained the following occurrence limit of liability

endorsement:

> 2.    The premium for this policy is based upon the statement of values on file with
> the company or attached to this policy. In the event of loss hereunder, **liability**
> **of the Company shall be limited to the least of the following:**
>
> (B)    **The total stated value of the property involved, as shown on the**
> **latest statement of values on file with the company** less applicable
> deductible(s). Id. at 1071-72.

In addition, the excess policy contained a similar clause:

Liability under our policy for our share of the "Ultimate Net Loss" shall not attach until the underlying insurer(s) have paid, admitted liability for, or have been held legally liable for the full amount of their respective participations of the "Ultimate New Loss."  But, **in no event, shall the "Ultimate Net Loss exceed the lesser of the following:**

b.      **Total Stated Value for the property lost or damaged, as shown on the latest statement of values on file with us.**

(*Emphasis added.*)

In rejecting the insured's contention that the primary and excess policies provided "blanket" coverage, the Louisiana Fifth Circuit Court of Appeals held that the "statement of values on file with us" meant that coverage was provided on a scheduled, rather blanket basis. *Fair Grounds* at 1072.  Thus, the insurers' maximum liability for covered loss in *Fair Grounds* was limited to the $16.6 million stated value of the grandstand appearing in the itemized list of values provided by the insured's broker.  *Id.* at 1074.  The court in *Fair Grounds* further held that Louisiana law did not require the schedules of value be physically attached to the policy and that policy language about "the latest statement of values on file with us" was sufficient to constitute incorporation of the property schedule by reference.  *Id.* at 1076 – 1077.

Applying the reasoning of these decisions to this case, the RSUI policy here unequivocally provides "scheduled" coverage.  *Ex. O* at pg. 82.  The facts establish that Maxus prepared and submitted the schedules listing the properties to be insured and their individual values.  *Ex. O* at pgs. 74-75.  RSUI bound scheduled coverage based on the schedule of property items submitted on Maxus' behalf and calculated the premium based the individual locations and specific exposures associated with each.  See, Exhibit *Ex. D*, Endorsement No. SP 2 569 0203.

Accordingly, RSUI's maximum liability for damage to the buildings at the Waverly Apartments on a replacement cost basis is limited to the sum of $6,588,160 set forth in the latest Statement of Values on file with RSUI minus the $4,850,000.00 received by Maxus for the

recovery for flood damage to the Waverly Apartments from the flood insurer as discussed in Part F below.

F.      **Maxus is not entitled to Replacement Cost Value for the damages to the Waverly Apartments.**

As a matter of law, Maxus is not entitled to replacement cost value ("RCV") until repairs are made as performance of repairs are a prerequisite to payment on a RCV basis. If Maxus does not rebuild, repair or replace, Maxus is then only entitled to valuation on an actual cash value basis. It is well-settled that actual cash value is equal to the replacement cost value of the property, less depreciation. *Munn v. National Fire Ins. Co. of Hartford*, 237 Miss. 641 (S.Ct. of Miss., 1959). In determining actual cash value, an allowance must be made for a property's age, condition, deterioration, depreciation and obsolescence. *Munn, supra*; *Fire Ass'n of Phil. V. Coomer*, 158 S.W.2d 355 (1942).

The FSIC policy here specifically requires repairs or replacement of the lost or damaged property in order to recover on an RCV basis. See, *Ex. D*, Building and Personal Property Coverage Form Section G(3).

Maxus' claim, as submitted, seeks recovery on a full RCV basis. There is no dispute that the Waverly location has never been repaired or replaced, thus Maxus is not entitled to recovery on a RCV basis. *Ex. T* at pg. 40; *Ex. C* at pg. 41. Neither Flagship nor Maxus' construction expert, Mr. David Dye, were ever requested to calculate actual cash value figures and as such, Maxus has never presented RSUI with an ACV figure to consider. *Ex. J* at pg. 83. Instead, they seek recovery on a RCV basis when Maxus admittedly failed to meet the condition precedent to a RCV recovery.

Courts are in agreement that an insured is only entitled to replacement cost coverage after repairs or replacement is made. In *Higgins v. Insurance Company of North America*, 256 Or.

30

151, 469 P.2d 766 (Or. 1970) *en banc*, the Supreme Court of Oregon found that the insurance policy at issue did not even contain a specific limitation that the insurer would only pay the actual cash value until repair or replacement was completed. However, the Court concluded that since the insureds had not expended anything in repairing or replacing the insured building, they were not eligible to recover under the replacement cost coverage of the policy. *Higgins, supra*.

In *Hess v. North Pacific Insurance Company*, 122 Wash.2d 180, 859 P.2d 586 (Wash. 1993) *en banc*, the Court faced a similar issue and held that the insureds under a fire insurance policy were only entitled to recover actual cash value of a destroyed dwelling unless actual repairs or replacement was undertaken and completed. *Hess, supra*. Replacement cost coverage inherently requires a replacement-substitute structure for the insured and the costs incurred by the insured in obtaining replacement; without them, replacement cost provisions becomes a "mere wager." *Harrington v. Amica Mutual Insurance Company*, 223 A.D.2 222, 645 N.Y.S.2d 221 (1996); *see also, Goman v. New Hampshire Insurance Company*, 159 F. Supp.2d 928 (N.D. Tex. 201).

Here, the valuation and replacement cost provisions in the FSIC policy, to which RSUI follows the form, expressly require repair or replacement of the damaged property as a condition precedent to replacement cost coverage. No question of fact exists that Maxus has undertaken virtually no repair or replacement of the property since the date of loss. *Ex. T* at pg. 40; *Ex. C* at pg. 41. Additionally, Maxus received approximately $4,250,000.00 in recovery from Hartford which paid its limits under a flood policy as well as an additional $600,000 from FSIC. Instead of repairing or rebuilding the Waverly, they used the insurance proceeds, in part, to satisfy the existing mortgage on Waverly. *Ex. T* at pg. 48; *Ex. C* at pgs. 172-174. None of the insurance recoveries received to date were used to repair or replace the damage as Waverly and as such, by

31

the express terms of the policy, Maxus' recovery, if any, is limited to actual cash value as a matter of law. Accordingly, Maxus is only entitled to coverage on an actual cash value basis for the damages to the Waverly Apartments.

      **G.**    **RSUI is entitled to a set-off for the payments made by First Specialty and Hartford.**

      As stated earlier, the Scheduled Limit of Liability Endorsement limits recovery on a replacement cost basis to a maximum of $6,588,160.00. Since Maxus never repaired or replaced the damaged property, the permissible recovery under the policy is limited to actual cash value. In addition to these limitations, RSUI is entitled to a set off as to those amounts previously received as set forth in RSUI's policy. No question of fact exists that Maxus received approximately $4,250,000.00 in flood coverage for Waverly and of the 2.5M received from FSIC, Maxus admitted that approximately $600,000 was applied towards the Waverly. Ex. T at pgs. 48, 113-117; Ex. C at pgs. 172-174. As such, of the $6,588,160.00 recoverable limit under the policy on a replacement cost basis, Maxus has admittedly received $4,850,000.00 and no repair or replacement has ever been undertaken. Ex. C at pgs. 172-174. Even assuming that the Waverly Apartments is a total loss, a fact which RSUI disputes, RSUI is only liable for $1,738,160.00 on a RCV basis, which represents the difference between the scheduled limit ($6,588,160.00) and the amount received from other insurers for the Waverly ($4,850,000.00). As such, as a matter of law, Maxus' recoverable limit is limited to $1,738,160.00 on a RCV basis, and only then if they actually perform the repairs and replacement necessary to entitle them to such recovery all of which is subject to applicable deductibles.

      The case of *Ferguson v. State Farm Insurance Company*, 2007 WL 1378507 (E.D.La., 2007), is particularly instructive. In *Ferguson*, the Court ruled that the fundamental purpose of property insurance is indemnity, not profit. See also, *Berkshire Mut. Ins. Co. v. Moffett,* 378

F.2d 1007, 1011 (5th Cir. 1967). As a general rule, an insured may recover under all available coverages provided that there is no double recovery. *Cole v. Celotex Corp.*, 599 So.2d 1058, 1080 (La. 1992).

Based on the above, RSUI is entitled to a set-off of the payments made by First Specialty and Hartford to Maxus towards any payment made by RSUI in connection with the damages sustained at the Waverly Apartments. To prohibit application of a set off would allow Maxus to obtain a double recovery on the same damage resulting in a windfall of profit. Such recovery would violate the basic tenets and theory of indemnity. Accordingly, RSUI is entitled to summary judgment on this issue.

## III. CONCLUSION

It is undisputed that the RSUI policy excludes coverage for loss or damage caused by flood. Additionally, the anti-concurrent causation clause unambiguously excludes coverage for flood damage even if another cause such as wind contributes concurrently or in any sequence to the loss. Thus, as a matter of law, RSUI respectfully requests this Honorable Court find that any damages to the Waverly Apartments caused exclusively, concurrently or in any sequence of the loss, by flood, be excluded from coverage under the RSUI policy.

Secondly, the RSUI policy is a "scheduled" policy and the Occurrence Limit of Liability Endorsement is clear and unambiguous. Courts have consistently held that a scheduled policy only provides coverage up to the values specified in the policy. Based upon the above, RSUI respectfully requests that its Motion for Partial Summary Judgment be granted, and that Maxus' claim for hurricane damage to buildings located at its Waverly Apartments location be limited to the latest Statement of Values on file with RSUI, thus limiting recovery to $6,588,160.00.

33

Thirdly, RSUI is entitled to summary judgment in its favor and respectfully requests this Honorable Court find that Maxus is only entitled to payment on an ACV basis for the damages to the Waverly Apartments as Maxus has admittedly failed to meet the condition precedent to recovery on a RCV basis in that they never repaired or replaced the subject property. As such, Maxus's recovery, if any, is limited to the ACV value of wind damage.

Finally, Maxus has been paid certain monies (combined amount of $4,850,000.00) by First Specialty and Hartford for the damages sustained at the Waverly Apartments caused by Hurricane Katrina. As a matter of law, RSUI is entitled to a set-off of these payments of these payments towards any payment made by RSUI in connection with the damages sustained at the Waverly Apartments.

Respectfully submitted,

CLAUSEN MILLER P.C.

By:_____s/Courtney E. Murphy_____
          Courtney E. Murphy, *admitted pro hac vice*
          David A. Group, *admitted pro hac vice*

One Chase Manhattan Plaza, 39th Floor
New York, New York 10005
Telephone:     (212) 805-3908
Facsimile:     (212) 805-3939

and

SHOOK, HARDY & BACON L.L.P.
George E. Wolf, Mo. # 35920
Douglas S. Beck, Mo. # 49984
Kelly G. Bieri, Mo. # 59060
2555 Grand Boulevard
Kansas City, Missouri 64108-2613
Telephone:     (816) 474-6550
Facsimile:     (816) 421-5547

ATTORNEYS FOR DEFENDANT
RSUI INDEMNITY COMPANY

34

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of October, 2007, the foregoing was electronically filed with

the Clerk of the Court using the CM/ECF system which sent notification of such filing to:

> Michael J. Abrams, Esq.
> Lathrop & Gage L.C.
> 2345 Grand Blvd. Suite 2500
> Kansas City, Missouri 64108
>
> ATTORNEYS FOR PLAINTIFF
> MAXUS REALTY TRUST GROUP

_____s/Douglas S. Beck_____
Attorney for Defendant
RSUI Indemnity Company