# Exhibit T

1  IN THE UNITED STATES DISTRICT COURT
   FOR THE WESTERN DISTRICT OF MISSOURI
2
3
4
   MAXUS REALTY TRUST, INC.,  )
5                              )
        Plaintiff,  )
6                              )
        vs.         )Case No. 06-0750-CV-W-ODS
7                              )
   RSUI INDEMNITY COMPANY     )
8                              )
        Defendant.  )
9
10
11
12              DEPOSITION OF
13               DeANN TOTTA
14   TAKEN ON BEHALF OF THE DEFENDANT
15             JULY 30, 2007
16
17
18
19
20
21
22
23
24
25

1    finishes asking the question because the record
2    will be a mess.
3  Q.  (By Ms. Murphy)  Starting with Interrogatory
4    No. 2 --
5  A.  Okay.
6  Q.  -- this is something that you contributed to or
7    participated in?
8  A.  Correct.
9  Q.  And according to the response, which speaks for
10   itself, no repair has been made to the property
11   since August 29, 2005; is that correct?
12 A.  That's correct.
13 Q.  To this day has any repair or rebuilding commenced
14   at the property?
15 A.  No.
16 Q.  Is there a reason why there has been no repair or
17   rebuilding to the property since August 29, 2005?
18 A.  I would have to leave that to my colleague.
19 Q.  Well, as a secretary and V.P., had there been any
20   efforts to undertake any repair or rebuilding
21   efforts at the Waverly?
22 A.  No, I don't believe I reported on any repairs.
23 Q.  Was there any -- I'm sorry, finish.
24 A.  No.
25 Q.  Was there any corporate decision to commence or

1 Q. In response to Interrogatory No. 4 dealing with
2    the mortgage companies or entities, the answer is
3    "At present there is no lien or mortgage due or
4    owed on the Waverly Apartments."
5       When was that satisfied?
6 A. February 17, 2006.
7 Q. Would it be fair to say that the monies received
8    from First Specialty were used to pay off that
9    mortgage?
10 A. That's correct. Part of which, that's correct,
11    uh-huh.
12 Q. Is there any part of that that's not correct?
13 A. No, that's correct. Those monies were used to pay
14    off the debt.
15 Q. Were there any reason why the 2.4 -- the 2.5
16    million was not used to make any repair or rebuild
17    anything at Waverly as opposed to satisfy the
18    mortgage?
19 A. Understand that of the 2.5 million First Specialty
20    earmarked 900,000 of that to the Waverly
21    Apartment. The remaining balance of 1.9 was
22    earmarked for Arbor Gate Acquisition, LLC.
23       MR. ABRAMS: I think you did your math
24    wrong.
25       THE WITNESS: I did?

1  had incurred by the hurricane.
2  Q.  (By Ms. Murphy) Was that amount in excess of six
3     million, was that based on any documentation?
4  A.  Yes.
5  Q.  Would that have been the Flagship estimate issued
6     in December of 2005?
7  A.  That's correct.
8  Q.  Would it be fair to say that Flagship was hired by
9     MPI to prepare an estimate estimating the costs of
10    the value -- rather -- strike that.
11            Would it be fair to say that Flagship was
12    hired to prepare an estimate estimating the amount
13    of damage sustained by Waverly?
14 A.  They were hired by counsel to give some sort of
15    representation as to the actual cost of the
16    damage.
17 Q.  Would it be fair to say that the estimate
18    concluded by Flagship was used in connection with
19    the insurance claim presented to the companies for
20    payment?
21 A.  Yes, that is correct.
22 Q.  In other words, it is MPI's position that payments
23    in excess of $6,000,000 should have been made
24    based upon Flagship's estimates; would that be
25    fair to say?

1  A.  Being the only estimate that we received at that
2      point, yes.
3  Q.  To your knowledge were there any subsequent
4      estimates prepared by Flagship relative to the
5      damage done at Waverly?
6  A.  Not to my knowledge.
7  Q.  Had you seen any subsequent estimates after May of
8      2006 from Flagship?
9  A.  No.
10 Q.  Have you heard of any subsequent estimates?
11 A.  No.  Not by Flagship, no.
12 Q.  By Flagship.  I understand that there were other
13     parties out there.
14 A.  Okay.  Okay.
15 Q.  But you will agree with me that this amount in
16     excess of 6,000,000 is based on the Flagship and
17     not these other consultants whether they be expert
18     or otherwise, correct?
19 A.  That's correct.
20 Q.  In connection with response to Interrogatory No.
21     14 --
22 A.  Uh-huh.
23 Q.  -- did you participate in the answer of this
24     interrogatory?
25 A.  No.

1  was sustained whether by video, witness or
2  otherwise, was there water damage to the property?
3           MR. ABRAMS:  Can you restate -- read back
4  that question.
5           (The last question was read by the
6  reporter.)
7           MR. ABRAMS:  I'm going to object as --
8  well, I'll object that it calls for speculation,
9  but go ahead.
10          You can answer.
11 Q.  (By Ms. Murphy)  If you don't know, you don't
12 know.
13 A.  Yeah, I don't know.
14 Q.  So you don't know how much, if any, of the damage
15 was caused by wind?
16 A.  No.  The report that we received from Flagship
17 dated in May of 2006 in which we referred to
18 earlier was wind damage.
19 Q.  To your knowledge, did the Flagship report
20 contain -- strike that.
21          To your knowledge, was the Flagship
22 report an estimate of all loss and damage
23 sustained by Waverly?
24 A.  No.
25 Q.  Did it carve out the specific type of damage

1 caused by a specific cause whether it be wind,
2 flood or something else?
3 A. Specifically wind damage to the property.
4 Q. And do you know whether the Flagship estimate
5 carved out the damage by floor of the buildings,
6 by location or something else?
7 A. I believe so, yes.
8 Q. And what's the basis for your understanding as to
9 how Flagship prepared the estimate and divided the
10 damage?
11 A. I do not -- I understand that through counsel
12 Flagship was hired to come up with an estimate for
13 wind damage to the property above a certain floor
14 line. That was supposedly to be for settlement
15 purposes only back in the earlier onset of the
16 claim. How they derived at those numbers for
17 those -- for the wind damage that occurred from
18 that floor line, I don't know.
19 Q. When we say the floor line, are you meaning the
20 floor that separates the first floor from the
21 second floor or are you referring to a water line?
22 A. Correct, second floor.
23 Q. The second floor?
24 A. Uh-huh.
25 Q. Is it your understanding that Flagship was told to