# EXHIBIT 1

1  IN THE UNITED STATES DISTRICT COURT
   FOR THE WESTERN DISTRICT OF MISSOURI
2
3
4

   MAXUS REALTY TRUST, INC.,    )
5                               )
        Plaintiff,               )
6                               )
        vs.              ) Case No. 06-0750-CV-W-ODS
7                               )
   RSUI INDEMNITY COMPANY        )
8                               )
        Defendant.               )
9
10
11
12              DEPOSITION OF
13           MICHAEL P. McROBERT
14   TAKEN ON BEHALF OF THE DEFENDANT
15              JULY 31, 2007
16
17
18
19
20
21
22
23
24
25

## Page 6

1. topics, so just fire away.
2.     MS. MURPHY: Okay.
3. A. Do you do anything with that or --
4. Q. (By Ms. Murphy) You can hold on to it.
5.     Sir, we're going to take your deposition
6. much like we took yesterday that you partially sat
7. in on. And just to reiterate the rules, I'm not
8. sure if you sat in at the beginning, but we'll be
9. asking questions relative to the losses sustained
10. by Maxus and to the extent that you answer them
11. I'm going to presume that you understood my
12. question; is that fair?
13. A. Yes.
14. Q. If you don't understand my question, just let me
15. know and I'll rephrase it so that you are
16. comfortable answering it in the form that I ask
17. it, correct?
18. A. Yes.
19. Q. All right. And you understand that in giving
20. testimony today it's no different than if you were
21. giving testimony in a court of law before a judge
22. and jury?
23. A. Yes.
24. Q. And you recognize, of course, that a transcript
25. will result from this hearing and it may be used

## Page 7

1. at the time of trial --
2. A. Yes.
3. Q. -- to the extent that it goes to trial? Okay,
4. thank you.
5.     Can you give me your full name, please.
6. A. Michael Paul McRobert.
7. Q. And who do you work for, sir?
8. A. Maxus Properties, Inc.
9. Q. Is that different than Maxus Properties Trust?
10. A. Maxus -- I'm not familiar with Maxus Properties
11. Trust. I think you mean --
12. Q. Correct.
13. A. -- Maxus Realty Trust, Inc.
14. Q. Thank you.
15. A. Yes, it is.
16. Q. How so?
17. A. Maxus Properties, Inc., is a management company.
18. Maxus Realty Trust, Inc., is a publicly-traded
19. entity on the NASDAQ but has no employees.
20. Q. Does Maxus property, Inc. -- can we refer to it as
21. MPI for short?
22. A. That's what I do.
23. Q. It has employees?
24. A. Yes.
25. Q. Approximately how many employees?

## Page 8

1. A. 280.
2. Q. Including yourself?
3. A. Yes.
4. Q. And what title, if any, do you hold at MPI?
5. A. Chief executive officer and president. I think
6. I'm a director also.
7. Q. How long have you held these positions?
8. A. Since July of 2004.
9. Q. How long have you been with the company in total?
10. A. July of 2004.
11. Q. When you started working for MPI did you
12. immediately start working in the positions of
13. chief executive officer, president and perhaps
14. director?
15. A. Yes.
16. Q. Prior to July 2004 where did you work?
17. A. Sunway Hotel Management, Inc.
18. Q. What is that?
19. A. A hotel management company.
20. Q. Where are they based out of?
21. A. Overland Park, Kansas.
22. Q. How long were you there for?
23. A. Two tours of duty.
24. Q. What does that mean?
25. A. I was there from '86 to '90 and from '95 to '04.

## Page 9

1. Q. Were they set terms?
2. A. No.
3. Q. I'm used to when you hear terms of duty --
4. A. Tours of duty.
5. Q. Tour of duty, right. Okay.
6.     Did you go anyplace in between '90 and
7. '95?
8. A. Yes.
9. Q. Where was that?
10. A. Ruhl and Company.
11. Q. And what is the nature of that business?
12. A. A valuation business.
13. Q. Valuation of what?
14. A. Real estate, commercial real estate.
15. Q. Do you have a commercial real estate license?
16. A. No.
17. Q. Do you maintain any licenses?
18. A. No.
19. Q. Appraisal, valuation or anything else, any
20. licensures?
21. A. No.
22. Q. Are you -- do you maintain any certifications?
23. A. No.
24. Q. Prior to today did you have any licenses or
25. certifications that you've since given up?

1  A. In isolation.
2  Q. I agree. Thank you.
3     MR. ABRAMS: Why are you thanking him?
4     MS. MURPHY: Because I do it out of
5     habit.
6  Q. (By Ms. Murphy) I'll ask you now to turn to
7     MAXUS145 within the First Specialty policy. And
8     you'll see in Subsection d on the left-hand side,
9     do you see that, sir?
10 A. Uh-huh.
11 Q. You were present during yesterday's testimony of
12    DeAnn Totta; were you not?
13 A. Yes.
14 Q. And --
15 A. Some of it.
16 Q. Some of it. And do you recall her testifying on
17    this particular provision?
18 A. No.
19 Q. Can you take a moment and read that paragraph.
20 A. (Witness complies.)
21 Q. You could stop at d(2).
22 A. Okay.
23 Q. If you turn to page MAXUS144, you'll agree with me
24    that Subsection d falls under Paragraph 3, the
25    replacement costs, correct?

1  A. Yes.
2  Q. Would you agree with me, sir, that pursuant to
3     Section d, according to the First Specialty
4     policy, until the lost or damaged property is
5     actually repaired or replaced First Specialty will
6     not pay on a replacement cost basis for any loss
7     or damage?
8  A. Yes.
9  Q. Would you agree with me that because Maxus Realty
10    has not repaired or replaced the damaged property
11    under this language, under the First Specialty
12    language, they would not have been entitled to
13    replacement costs?
14    MR. ABRAMS: Objection, calls for a legal
15    conclusion.
16    You can answer if you know.
17 A. I guess, no, I wouldn't agree with you from a
18    standpoint that we've never had a settlement offer
19    that put us in a position to replace.
20 Q. (By Ms. Murphy) I understand that's the position
21    of Maxus. I'm referring exclusively to this
22    language. I'm saying that under the terms of
23    Section d, would you agree with me that because --
24    and I understand that Maxus has its reasons, which
25    we've discussed. But just exclusively referring

1  to Section d, since Maxus did not repair or
2  replace the damaged property, under the First
3  Specialty property they had no obligation to
4  provide coverage on a replacement cost basis?
5     MR. ABRAMS: She's talking about First
6     Specialty.
7     Same objection, but you can answer if you
8     know.
9  A. I mean, I would defer that -- I don't know that
10    I've got the expertise in insurance to opine to
11    that.
12 Q. (By Ms. Murphy) Well, I'm just going by the basic
13    wording of Section d, sir.
14    MR. ABRAMS: Is there a question?
15    MS. MURPHY: Yes.
16 Q. (By Ms. Murphy) And the question is, the policy
17    says -- the First Specialty policy says they will
18    not pay on a replacement cost basis for any loss
19    or damage unless it's actually repaired or
20    replaced; does it not?
21 A. Yes.
22 Q. Following this language and inserting Maxus into
23    this Paragraph d, according to the First Specialty
24    policy, First Specialty has no obligation to pay
25    Maxus on a replacement costs basis because they

1  have not repaired or replaced the property as
2  Section d requires; would you agree with that?
3     MR. ABRAMS: That's the same question you
4     asked before. You can give --
5     MS. MURPHY: I reformulated it.
6     MR. ABRAMS: Right, but it's the same
7     thing.
8     MS. MURPHY: I understand that, but I
9     didn't get an answer before.
10    MR. ABRAMS: Yeah, he did. He said he
11    didn't know.
12    MS. MURPHY: Please stop coaching the
13    witness.
14 A. Well, my statement I think previously, and I'll
15    stay with it, is --
16    MR. ABRAMS: Please stop restating the
17    question.
18 A. -- I would defer that to either counsel or an
19    expert in insurance.
20 Q. (By Ms. Murphy) Is Section d confusing to you?
21 A. The context of it.
22 Q. Can you identify what's confusing about d? With
23    the opening paragraph, "We will not pay on a
24    replacement cost basis for any loss or damage," is
25    that confusing?

Page 118

1  Q. Was that -- to the best of your recollection, did
2     that occur during that meeting of July 2006?
3  A. I honestly don't remember.
4  Q. But at any time between May 31st, 2006, up until
5     the date that the complaint was filed, which was
6     on or about September 7, 2006, had you or anybody
7     at Maxus indicated that the claim was subject to
8     change?
9        MR. ABRAMS: Objection, lack of
10     foundation.
11       If you know you can answer.
12 A. I'll answer yes from a standpoint that we were
13    having settlement discussion and trying -- there
14    were numerous discussions about how to attempt to
15    settle the claim and find some kind of common
16    ground.
17 Q. (By Ms. Murphy) Were there any communications by
18    and between yourself and any representative of
19    Maxus and Engle and Martin indicating that these
20    numbers were going to change or increase?
21 A. I think as we sat at the table and had discussions
22    as far as where we were picking and drawing lines
23    it was a fluid situation.
24 Q. Would that be, no, there are no documentations or
25    communications by and between the parties other

Page 119

1     than those orally made during that meeting?
2  A. Any communications would have been oral at that
3     point.
4  Q. And this claim did not get modified until some
5     point into the litigation for the purposes of
6     litigation; is that correct?
7  A. The claim was further refined and better
8     documented for the purposes of litigation.
9  Q. Can you tell me in what way the claim was refined
10    and better documented?
11 A. Just in the experts, the consultation that was
12    performed by -- Flagship was engaged by our legal
13    counsel for internal purposes towards trying to
14    come up with a number to settle the deal.
15 Q. Was there any aspect of the Flagship estimate that
16    Maxus deemed to be inadequate, insufficient or
17    something else?
18 A. Yes.
19 Q. What was that?
20 A. The fact that it didn't include the first floor.
21 Q. And do you believe that that was a mistake by
22    Flagship?
23 A. I think it was a -- it was a bright line that was
24    drawn in some attempt to find middle ground for
25    settlement purposes.

Page 120

1  Q. Back in December of 2005?
2  A. Yes.
3  Q. Settlement with whom?
4  A. Well, in trying to come up with a number to
5     negotiate toward.
6  Q. With First Specialty?
7  A. With First Specialty as well, yes.
8  Q. Well, we had just discussed the fact that this
9     claim had not even been presented to RSUI until
10    May of 2006; isn't that accurate?
11 A. Like I say, I lose track of the two. I'm not even
12    sure -- can you tell me what date we settled with
13    First Specialty?
14 Q. In or about February of 2007.
15 A. Okay. Brian O'Connor --
16       MR. ABRAMS: 2007.
17       MS. MURPHY: You would be in a better
18    position to have that information. I don't have
19    the release information.
20       MR. ABRAMS: That was produced.
21       MS. MURPHY: I don't know because I asked
22    Mr. O'Connor to look through his records and
23    unfortunately he has to see if he can get it from
24    First Specialty.
25       MR. ABRAMS: The date of the release is

Page 121

1     May 18, 2006.
2        MS. MURPHY: Okay, thank you.
3  Q. (By Ms. Murphy) With that said, is it your
4     opinion that -- or the position of Maxus that the
5     Flagship estimate was inadequate or deficient
6     because it did not quantify damage to the lower
7     floor?
8  A. Yes.
9  Q. And it is your belief or opinion that they did not
10    quantify the damage to the lower floor because an
11    effort towards settlement was endeavored between
12    First Specialty and Maxus?
13 A. Yes.
14 Q. And would you agree with me that at that time no
15    claim had been presented to RSUI in or about
16    December of 2005 when that bright line was issued?
17 A. Yes.
18       MR. ABRAMS: I would object that it
19    lacked foundation.
20       If you know.
21 Q. (By Ms. Murphy) Who retained Flagship on behalf
22    of Maxus?
23 A. Rob Thomson. Robert Thomson.
24 Q. He is the general counsel for Maxus Realty?
25 A. No.